**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page.]*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANCE WONDERLY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> AARDVARK THERAPEUTICS, INC., TIEN-LI LEE, NELSON SUN, BRYAN JONES, JEFFREY CHI, ROY D. BAYNES, SUSAN E. GRAF, and VICTOR TONG, JR., <br><br> Defendants. | Case No. **'26 CV 4643 BJC GC** <br><br> CLASS ACTION <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Vance Wonderly ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through

1

Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aardvark Therapeutics, Inc. ("Aardvark" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Aardvark common stock pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about February 13, 2025 (the "IPO" or "Offering"); and/or (b) Aardvark securities between February 13, 2025 and May 14, 2026, both dates inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Aardvark is a clinical-stage biopharmaceutical company that focuses on developing small-molecule therapies designed to inhibit hunger and treat metabolic diseases such as Prader-Willi Syndrome ("PWS"), a neurodevelopmental

2

disorder condition that presents hyperphagia, or a feeling of extreme, insatiable hunger.

3.    At all relevant times, Defendants have represented that Aardvark's product candidates are unique because they target hunger, which is the need to avoid pain and discomfort from a lack of food consumption, rather than appetite, which is an affirmative desire for reward or pleasure from food consumption.

4.    Aardvark has focused its efforts on developing selective compounds that target Bitter Taste Receptors ("TAS2Rs") for hunger-associated conditions. Per Defendants' research, activating TAS2Rs can induce secretion of endrogenous signaling molecules, including cholecystokinin ("CCK") and glucagon-like peptide-1 ("GLP-1").    Defendants further claim that CCK "has long been recognized as a promising pharmaceutical target because its release is triggered with food and helps suppress hunger".

5.    The Company's lead product candidate is ARD-101, which Defendants have described as a "gut-restricted" small-molecule agonist of certain TAS2Rs expressed in the gut lumen.    To evaluate the effect of ARD-101 on hyperphagia-related behavior in patients with PWS, Defendants commenced both a Phase 3 clinical trial, referred to as the Hunger Elimination or Reduction Objective ("HERO") trial, and an open-label extension.

3

6. On January 23, 2025, Aardvark filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after amendment, was declared effective by the SEC on February 12, 2025 (the "Registration Statement").

7. On February 13, 2025, Aardvark filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

8. The same day, Aardvark's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "AARD".

9. Pursuant to the Offering Documents, Aardvark issued 5,888,000 shares of its common stock to the public at the Offering price of $16.00 per share for proceeds of $87,613,440, after underwriting discounts and commissions.

10. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Offering Documents and Defendants made false and/or misleading statements and/or failed to disclose that: (i) ARD-101 was less safe than Defendants had led investors to believe; (ii) accordingly, ARD-101's clinical, regulatory, and

4

commercial prospects were overstated; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

11.   The truth began to emerge on February 27, 2026, when Aardvark issued a press release "announc[ing] it is voluntarily pausing the Phase 3 Hunger Elimination or Reduction Objective (HERO) trial."   Aardvark attributed the decision to "reversible cardiac observations at above target therapeutic doses found during routine safety monitoring in a healthy volunteer study" and said that it "has voluntarily paused ongoing enrollment and dosing in the HERO trial" while "conducting a comprehensive review of the data to inform next steps."

12.   On this news, Aardvark's stock price fell $7.02 per share, or 56.2%, to close at $5.47 per share on March 2, 2026.

13.   Then, on May 14, 2026, Aardvark issued a press release "announc[ing] that the U.S. Food and Drug Administration (FDA) has placed a full clinical hold on its investigational new drug application (IND) for ARD-101 related to the Company's previously announced voluntary pause."   The press release specified that "[t]he clinical hold applies to all ongoing clinical studies under the IND, including the Phase 3 HERO trial (AVK-101-301) evaluating ARD-101 for the treatment of hyperphagia in patients with Prader-Willi Syndrome (PWS) and the Phase 3 open-label extension (OLE) trial (AVK-101-302)."

14.   On this news, Aardvark's stock price fell $2.16 per share, or 32.1%, to close at $4.57 per share on May 15, 2026.

5

15. As of the time this Complaint was filed, Aardvark's common stock continues to trade below the $16.00 per share Offering price, damaging investors.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Aardvark's securities, Plaintiff and other Class members have suffered significant losses and damages.

### JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Aardvark is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

20. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PARTIES**

21.     Plaintiff, as set forth in the attached Certification, acquired Aardvark common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or purchased or otherwise acquired Aardvark securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22.     Defendant Aardvark is a Delaware corporation with principal executive offices located at 4370 La Jolla Village Drive, Suite 1050, San Diego, California 92122.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AARD".

23.     Defendant Tien-Li Lee, M.D. ("Lee"), has served as Aardvark's Chief Executive Officer and a Director on the Company's Board of Directors (the "Board") at all relevant times.  Defendant Lee signed or authorized the signing of the Registration Statement filed with the SEC.

24.     Defendant Nelson Sun ("Sun") has served as Aardvark's Chief Financial Officer at all relevant times.  Defendant Sun has also served as the Company's Chief Operating Officer since February 9, 2026.  Defendant Sun signed or authorized the signing of the Registration Statement filed with the SEC.

25.     Defendant Bryan Jones, Ph.D. ("Jones"), served as Aardvark's Chief Operating Officer from before the start of the Class Period until February 9, 2026.

7

26.    Defendants Lee, Sun, and Jones are collectively referred to herein as the "Exchange Act Individual Defendants."

27.    The Exchange Act Individual Defendants possessed the power and authority to control the contents of Aardvark's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Aardvark's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Aardvark, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

28.    Aardvark and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants."

29.    Defendant Jeffrey Chi, Ph.D., CFA ("Chi"), has served as a Director on the Company's Board at all relevant times.  Defendant Chi signed or authorized the signing of the Registration Statement filed with the SEC.

8

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30. Defendant Roy D. Baynes, M.D., Ph.D. ("Baynes"), has served as a Director on the Company's Board at all relevant times. Defendant Baynes signed or authorized the signing of the Registration Statement filed with the SEC.

31. Defendant Susan E. Graf, RPh, MBA ("Graf"), has served as a Director on the Company's Board at all relevant times. Defendant Graf signed or authorized the signing of the Registration Statement filed with the SEC.

32. Defendant Victor Tong, Jr. ("Tong") has served as a Director on the Company's Board at all relevant times. Defendant Tong signed or authorized the signing of the Registration Statement filed with the SEC.

33. The Exchange Act Individual Defendants and Defendants Chi, Baynes, Graf, and Tong are collectively referred to herein as the "Securities Act Individual Defendants."

34. As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Aardvark securities in the IPO for their own benefit and the benefit of Aardvark. The Securities Act Individual Defendants were key members of the IPO working group and executives of Aardvark who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

35. Aardvark and the Securities Act Individual Defendants are collectively referred to herein as the "Securities Act Defendants".

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

36. The Exchange Act Defendants and Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants".

## SUBSTANTIVE ALLEGATIONS

## Background

37. Aardvark is a clinical-stage biopharmaceutical company that focuses on developing small-molecule therapies designed to inhibit hunger and treat metabolic diseases such as PWS, a neurodevelopmental disorder condition that presents hyperphagia, or a feeling of extreme, insatiable hunger.

38. Defendants represent that Aardvark's product candidates are unique because they target hunger, which is the need to avoid pain and discomfort from a lack of food consumption, rather than appetite, an affirmative desire for reward or pleasure from food consumption.

39. Aardvark has focused its efforts on developing selective compounds that target TAS2Rs for hunger-associated conditions. Per Defendants' research, activating TAS2Rs can induce secretion of endrogenous signaling molecules, including CCK and GLP-1. Defendants further claim that CCK "has long been recognized as a promising pharmaceutical target because its release is triggered with food and helps suppress hunger".

40. The Company's lead product candidate is ARD-101, which Defendants have repeatedly described as a "gut-restricted" small-molecule agonist of certain TAS2Rs expressed in the gut lumen. To evaluate the effect of ARD-101

10

on hyperphagia-related behavior in patients with PWS, Defendants commenced both a Phase 3 clinical trial, referred to as the HERO trial, and an open-label extension.

41.    On January 23, 2025, Aardvark filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after an amendment, was declared effective by the SEC on February 12, 2025.

42.    On February 13, 2025, Aardvark filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

43.    The same day, Aardvark's common stock began publicly trading on the NASDAQ under the ticker symbol "AARD".

44.    Pursuant to the Offering Documents, Aardvark issued 5,888,000 shares of the Company's common stock to the public at the Offering price of $16.00 per share for proceeds of $87,613,440, after underwriting discounts and commissions.

**Materially False and Misleading Statements Issued in the Offering Documents**

45.    The Offering Documents included an overview of Aardvark's operations to date, summarizing its lead product candidate ARD-101, claiming that their Phase 2 clinical trial of ARD-101 showed it "to be well-tolerated", announcing

11

the commencement of a "***potentially pivotal***"[1] Phase 3 clinical trial of ARD-101 and Defendants' expectation that they would report data from that trial by early 2026, stating *inter alia*:

> Our wholly-owned lead product candidate, ARD-101 (denatonium acetate monohydrate), is an oral gut-restricted small-molecule agonist of certain TAS2Rs expressed in the gut lumen for which we have initiated a Phase 3 clinical trial for hyperphagia associated with Prader-Willi Syndrome (PWS). . . . ***In our completed Phase 2 clinical trial in subjects with hyperphagia associated with PWS, ARD-101 was shown to be well-tolerated*** and demonstrated clinical activity through a reduction in Hyperphagia Questionnaire for Clinical Trials (HQ-CT) score. ***We have aligned with the U.S. Food and Drug Administration*** (the FDA) ***on a protocol for a potentially pivotal Phase 3 clinical trial, which we initiated in December 2024, and we anticipate topline data will be available in early 2026***.

46.    The Offering Documents discussed ARD-101's safety profile, representing that ARD-101 had been "well-tolerated" in Defendants' clinical trials to date because it "has limited systemic absorption", stating *inter alia*:

> ***ARD-101 has limited systemic absorption***, ***which we believe reduces the potential for systemic toxicity and has contributed to ARD-101 being well-tolerated in our clinical trials to date***.   We have completed a Phase 1 clinical trial of ARD-101 in healthy volunteers and a Phase 2 clinical trial in subjects with hyperphagia associated with PWS.  The Phase 2 clinical trial in hyperphagia associated with PWS evaluated two dosing regimens over 28 days followed by a 14-day withdrawal period. In the first part of the trial, 12 subjects completed the treatment period at a dose of 200 mg delivered orally twice daily (BID).  ***These 12 subjects who completed treatment had no treatment-related adverse events*** and, of those subjects, the eight who had HQ-CT 9 scores saw an average decline in HQ-CT 9 score of approximately eight points at 28 days.  In the second part of the trial, four subjects were dosed under

---

[1] All emphases herein have been added unless otherwise indicated.

a revised protocol: 400 mg BID for seven days, followed by 600 mg BID for seven days and ending with 800 mg BID for 14 days. ***The four subjects who completed the trial per protocol had only grade 1 treatment-related adverse events*** and showed a decrease in HQ-CT 9 of approximately eight points at 28 days.

47. Also in the Offering Documents, Defendants stated that they had "aligned with the FDA on a trial design" for their then-upcoming HERO trial, and that they "believe[d]" that the HERO trial would "be sufficient to support a new drug application (NDA) filing with the FDA", stating *inter alia*:

> We have aligned with the FDA on a trial design for the Phase 3 clinical trial, refer to as the HERO (Hunger Elimination or Reduction Objective) trial, which we believe will be sufficient to support a new drug application (NDA) filing with the FDA.

48. The Offering Documents further stated that ARD-101 was "found to be 99% restricted to the gut with minimal systemic exposure" and "resulted in no serious adverse events", stating *inter alia*:

> Previous attempts at pharmaceutical development of CCK receptor agonists included the development of long-acting systemic CCK analogues by chemically altering the natural CCK to extend the half-life and by administering it as a subcutaneous depot. These development programs were discontinued because of unintended on-target off-tissue toxicities, including pancreatitis. We believe that ARD-101 elicits expression of CCK in a localized manner in the peri-gut region to selectively elicit vagal gut-brain signaling without significant concomitant rise in systemic CCK. ***In our preclinical studies and clinical trials to date, ARD-101 was found to be approximately 99% restricted to the gut with minimal systemic exposure, and was well-tolerated at all dose levels***. ***It resulted in no serious adverse events (SAEs), no renal or hepatic safety limitations***, ***no additive side effects with standard of care medications and no evidence of immunosuppression***.

13

49.    Further, the Offering Documents provided investors with a summary of Defendants' preclinical data concerning ARD-101, stating that such the studies that yielded this data "suggest that ARD-101 shows potential to be a well-tolerated, satiety-inducing drug", describing Defendants' preclinical trial data and stating *inter alia*:

> We have evaluated the tolerability and efficacy of ARD-101 in proof-of-concept preclinical models that support ARD-101's potential to address the hyperphagia in hypothalamic syndromes, including PWS as well as obesity and obesity-related conditions. ***Our preclinical studies suggest that ARD-101 shows potential to be a well-tolerated, satiety-inducing drug***.    Animal models of obesity showed ARD-101's potential to decrease food intake and body weight without treatment tachyphylaxis, or rapidly diminishing response to successive doses of a drug, even with chronic daily administration. . . .    ***[O]rally administered ARD-101 was observed to have minimal systemic exposure***, as seen in Figure 8 below, with approximately 99% of ARD-101 staying in the digestive tract, as evidenced by less than 1% bioavailability observed in mouse and monkey pharmacokinetic models, along with high fecal concentrations in mice following oral administration of ARD-101.

50.    Similarly, the Offering Documents included a summary of Defendants' Phase 1 clinical trial of ARD-101, in which the Offering Documents stated that "***ARD-101 was well tolerated by subjects***", stating *inter alia*: "We completed a Phase 1 clinical trial of ARD-101 healthy volunteers in 2021. . . . ARD-101 was well-tolerated by subjects.    Investigator-identified treatment-emergent adverse events (TEAEs) were limited to grade 1 or 2 . . . ."

14

51.     The Offering Documents also included a summary of the preliminary results from Defendants' Phase 2 clinical trial of ARD-101, again characterizing ARD-101 as "well-tolerated" and stating *inter alia*:

> We also evaluated ARD-101 in an open-label Phase 2 clinical trial in subjects with hyperphagia associated with PWS. . . .  We currently possess preliminary, non-published data from the first and second parts of the trial. . . .  Based on the preclinical modeling showing that doses above 200 mg BID have potential for greater efficacy and that ***ARD-101 was well-tolerated in the first part of the Phase 2 clinical trial*** with most of the benefit being achieved within 15 days, we initiated the second part of the Phase 2 clinical trial . . .  Efficacy and safety data from the second part of the trial are shown below in Figures 15 and 16. ***[Adverse events] observed in the second part of the trial were mild in all cases***. . . .  After seeing the majority of patients following protocol in the second part of our Phase 2 trial experiencing dose dependent decreases in HQ-CT 9 scores with no safety signal beyond grade one AEs, we decided to advance that dosing scheme for evaluation in our Phase 3 trial.

52.     The statements referenced in ¶¶ 45–51 were materially false and/or misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) ARD-101 was less safe than Defendants had led investors to believe; (ii) accordingly, ARD-101's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

15

**Materially False and Misleading Statements Issued During the Class Period**

53.    The Class Period begins on February 13, 2025, when Aardvark's common stock began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions in the Offering Documents, as referenced in ¶¶ 45–51, *supra*.

54.    On March 31, 2025, Aardvark filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2024 (the "FY 2024 10-K") and issued a press release announcing the same.  This press release represented to investors that the Company's Phase 2 trial of ARD-101 "showed multiple encouraging signals" and repeated Defendants' expectation that topline data from the Phase 3 HERO trial would be available "in early 2026", stating *inter alia*:

> Summary of Business Highlights: Phase 2 data for the treatment of hyperphagia associated with PWS showed multiple encouraging signals.  As a result, Aardvark has advanced its clinical pipeline with the initiation of the potentially pivotal Phase 3 HERO (Hunger Elimination or Reduction Objective) trial evaluating ARD-101 for hyperphagia associated with PWS. . . .  Anticipated Milestones: . . . Topline data from the Phase 3 HERO trial for the treatment of hyperphagia associated with PWS is expected in early 2026.

55.    The FY 2024 10-K represented that Defendants believed ARD-101 did not present safety issues due to its "limited systemic absorption," stating *inter alia*: "ARD-101 has limited systemic absorption, which we believe reduces the

16

potential for systemic toxicity and has contributed to ARD-101 being well-tolerated in our clinical trials to date."

56.    On May 14, 2025, Aardvark filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q"), and issued a press release announcing the same.  Like the Offering Documents, this Form 10-Q stated that ARD-101 was "well-tolerated" in Defendants' Phase 2 clinical trial, stating *inter alia*:

> Our wholly-owned lead product candidate, ARD-101, is an oral gut-restricted small-molecule agonist of certain TAS2Rs expressed in the gut lumen for which we have initiated a Phase 3 clinical trial for hyperphagia associated with Prader-Willi Syndrome (PWS). . . .  In our completed Phase 2 clinical trial in subjects with hyperphagia associated with PWS, ARD-101 was shown to be well-tolerated . . . .

57.    On May 15, 2025, Defendant Lee appeared on behalf of Aardvark at the Bank of America Securities 2025 Healthcare Conference.   During this appearance, Defendant Lee discussed ARD-101's safety profile, stating *inter alia*: "[W]e've completed phase one and several phase IIs in different populations, including in Prader-Willi syndrome.  Overall, we've had over 70 patients that have been dosed ARD-101.  ***We have not seen anything more than a grade 2 AE across our studies***."

58.    On May 20, 2025, Defendant Jones appeared on behalf of Aardvark at the H.C. Wainwright 3rd Annual BioConnect Investor Conference 2025.  During

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

this appearance, Defendant Jones represented that ARD-101 had a "[v]ery, very clean [safety] profile", and that due to ARD-101's purported restriction to the gut, "[t]he chance of side effects is very, very low because you're not getting exposure to other tissues", stating *inter alia*:

> The key point about the study is, number one, we had essentially no adverse events in phase I. Very, very clean profile. This makes a lot of sense because our drug is really a topical treatment for the gut. 99% of the drug stays in the gut. Less than 1% gets into the bloodstream. The chance of side effects is very, very low because you're not getting exposure to other tissues.

59. Defendant Jones continued to discuss Defendants' Phase 3 HERO trial of ARD-101, representing that Defendants had "discussed this with the FDA", stating *inter alia*: "As I mentioned before, our phase three is ongoing. We've discussed this with the FDA. This is potentially a single pivotal study."

60. On September 3, 2025, Defendant Lee appeared on behalf of Aardvark at the Cantor Global Healthcare Conference 2025. During this appearance, Defendant Lee stated that Aardvark's pipeline included "a unique category of drugs" that is "gut-restricted, stating *inter alia*:

> Aardvark is a San Diego-based biotech company. We're focused on small molecule drug development. We have a unique category of drugs. It's a gut-brain signaling drug. It's small molecule, oral, but ***it's gut-restricted, and it mostly stays in your gut***, but it's signaling gut-brain pathway to mediate a bunch of things, including abrogating hunger.

61. On September 8, 2025, Defendant Lee appeared on behalf of Aardvark at the Morgan Stanley 23rd Annual Global Healthcare Conference.

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

During this appearance, when asked about Defendants' Phase 2 trial of ARD-101 and "what made it so promising", Defendant Lee stated that results from the trial gave Defendants "confidence" that in attempting a higher dose, which Defendant Lee stated was "far below the toxic limit of our drug", stating *inter alia*:

> Initially, for the first 12 subjects in our phase 2 study, we had a 200 mg b.i.d. . . . ***Our dose is very, very far away from the theoretic toxic limit of our drug***. In the second part of our phase II study, we tested a dose escalation protocol, and we saw encouraging results that gave us confidence that 800 mg b.i.d. was an optimal dose to utilize. ***That still represents a dose that's far below the toxic limit of our drug***. ***We didn't see any new AEs that caused concern at that dosing***. Our go-forward dose will be a target of 800 mg twice a day.

62. When asked "why the safety profile was so clean at that higher dose", Defendant Lee represented that ARD-101 "has a very unique property" in that it is "99% gut-restricted, so less than 1% systemic availability". Defendant Lee further stated that ARD-101's "***lack of systemic exposure also diminishes concern for . . . cardiac toxins, and so forth***", stating *inter alia*:

> ***The drug has a very unique property. It's 99% gut-restricted, so less than 1% systemic availability***. It's very paradoxical because most oftentimes you're not looking for a drug with low oral availability. The target of our drug is in the lumen of the gut. The gut restriction is not an impediment, but actually a feature that really augments the on-target efficiency of the drug and reduces the systemic exposure. ***That lack of systemic exposure also diminishes concern for renal, oral, cardiac toxins, and so forth***. ***I think the physical restriction of the drug in the gut is very contributory to its unique safety profile***.

63. On November 5, 2025, Aardvark held its Aardvark Therapeutics Obesity Week Investor Webinar. During this event, Defendant Lee represented

19

once again that ARD-101's safety profile flowed from its "unique" nature as a "99% gut-restricted" drug, stating *inter alia*: "We think that ARD-101 has some unique properties that really help with the safety profile in the fact that it is 99% gut-restricted."

64.    On November 13, 2025, Aardvark filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2025, and issued a press release announcing the same. Like the Q1 2025 10-Q, this filing stated, *inter alia*, that "[i]n our completed Phase 2 clinical trial in subjects with hyperphagia associated with PWS, ARD-101 was shown to be well-tolerated[.]"

65.    The statements referenced in ¶¶ 53–64 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) ARD-101 was less safe than Defendants had led investors to believe; (ii) accordingly, ARD-101's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, the Exchange Act Defendants' public statements were materially false and misleading at all relevant times.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**The Truth Begins to Emerge**

66.    The truth began to emerge on February 27, 2026, when Aardvark issued a press release "announc[ing] it is voluntarily pausing the Phase 3 Hunger Elimination or Reduction Objective (HERO) trial" (the "February 2026 Release"). Aardvark attributed the decision to "reversible cardiac observations at above target therapeutic doses found during routine safety monitoring in a healthy volunteer study" and said that it "has voluntarily paused ongoing enrollment and dosing in the HERO trial" while "conducting a comprehensive review of the data to inform next steps."   The February 2026 Release also revealed that Aardvark no longer expected to report results from the HERO trial on their anticipated timeline: "Aardvark no longer anticipates announcing topline data from the HERO trial in the third quarter of 2026".

67.    On this news, Aardvark's stock price fell $7.02 per share, or 56.2%, to close at $5.47 per share on March 2, 2026.

68.    Following Defendants' revelations, several analysts lowered their respective price targets for Aardvark's stock.  On March 2, 2026, Morgan Stanley Research downgraded Aardvark's stock from Overweight to Equal-weight, and reduced its price target approximately 75.9%, from $29 to $7, citing "uncertainty around the path forward for ARD-101" in light of Defendants' voluntary pause of their Ph3 HERO trial of ARD-101, and their revelation that "Aardvark plans to provide a[] comprehensive update on the program in 2Q26, but now no longer

21

expects topline data from the Ph3 HERO study in 3Q26." Also on March 2, 2026, BTIG reduced its price target approximately 65.4%, from $26 to $9, citing "increased risk around the HERO trial", and writing that the Company's new expectation that trial data would not arrive in the third quarter of 2026 was "a major setback, leading to concerns around time to resolution vs. cash runway and prospects for HERO long term." On that same date, Bank of America Securities reduced its price target approximately 16%, from $25 to $21, citing the fact that "HERO topline data is no longer expected in 3Q26" after Defendants' voluntary pause of the Ph3 HERO trial.

69. Notwithstanding the foregoing disclosures and resulting drop in Aardvark's share price, Aardvark's stock continued to trade at artificially inflated prices due to Defendants' continued false and misleading statements about the safety profile of ARD-101.

70. For example, in the February 2026 Release, Aardvark reaffirmed its "commit[ment] to advancing the ARD-101 clinical program" and suggested that doing so could depend simply on dosing, rather than a fundamental issue with the mechanism through which ARD-101 impacts hunger: "We are committed to advancing the ARD-101 clinical program and we are evaluating optimal therapeutic dosing levels to support its progress."

71. On March 23, 2026, Aardvark filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

quarter and year ended December 31, 2025, and issued a press release announcing the same (the "FY 2025 Earnings Release").  That press release quoted Defendant Lee as touting ARD-101's "positive clinical data[ and] encouraging safety profile from previous trials" and Defendants "strong[] belie[f]" that ARD-101 "retains its potential as a differentiated therapeutic option" despite the cardiac observations that prompted Defendants to voluntarily pause the HERO trial and open-label extension. This press release also quoted Defendant Lee as projecting that Defendants would "provide further guidance" concerning the HERO trial "in the second quarter of 2026", stating *inter alia*:

> "Patient safety will always be our highest priority, and we are actively engaging with the FDA with urgency to determine the best path forward for our programs. . . ." said Tien Lee, M.D., Founder and Chief Executive Officer of Aardvark. "***With positive clinical data, an encouraging safety profile from previous trials and our recently developed understanding of the clear blood plasma exposure-response relationship with reversible cardiac QRS prolongation, we have confidence in ARD-101.  We strongly believe that ARD-101 retains its potential as a differentiated therapeutic option for hyperphagia in individuals living with PWS***.  We hope to resume the PWS development program in a timely manner and expect to provide further guidance on each of our programs in the second quarter of 2026."

72.    The February 2026 Release also provided investors with a series of "Pipeline Updates", including one concerning Defendant's voluntary pause of the Phase 3 HERO and open-label extension ARD-101 studies.  In this update, the February 2026 Release stated that the cardiac observations that prompted the voluntary pause were "unexpected", that "[n]o cardiac signals were observed in the

23

prior Phase 1 or Phase 2 clinical trials", and that "preclinical studies did not predict the expectation of cardiac safety liabilities", stating *inter alia*:

> In February 2026, the company announced a voluntary pause in enrollment and dosing in the Phase 3 Hunger Elimination or Reduction Objective (HERO) and open-label extension (OLE) trials evaluating ARD-101 for the treatment of hyperphagia in individuals with PWS following unexpected reversible cardiac observations in a separate healthy volunteer trial (non-PWS individuals). . . . ***No cardiac signals were observed in the prior Phase 1 or Phase 2 clinical trials, and preclinical studies did not predict the expectation of cardiac safety liabilities***.

73.    The February 2026 Release also attempted to distance the cardiac observations from ARD-101 by highlighting differences in dosing between the healthy volunteer study and the HERO study and stating the cardiac observations "were not reported as serious adverse events, were not accompanied by serious cardiac symptoms, and were reversible upon drug discontinuation and without medical intervention", stating *inter alia*:

> Two of eight participants experienced increases in QRS duration[2] greater than 25% from baseline, and one additional participant had a QRS increase of less than 25% from baseline.  A finding of QRS duration greater than 25% of baseline was considered significant per protocol.  ***These participants in the healthy volunteer study were dosed at 1,600 mg twice daily without prior dose escalation, representing twice the target dose used in the HERO study (800 mg twice daily)***.  ***The dosing in this healthy volunteer study is also in contrast to the dose-escalation approach used in the HERO trial***, where patients received ARD-101 in a stepwise dose escalation: first at 200 mg twice daily for one week, then 400 mg twice daily for one week,

---

[2] QRS duration refers to the amount of time required for the electrical activation of the heart's lower chambers, which prompts them to pump blood through the heart.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

then 800 mg twice daily for 10 weeks. *All QRS increases were not reported as serious adverse events, were not accompanied by serious cardiac symptoms, and were reversible upon drug discontinuation and without medical intervention*.

74.    On May 7, 2026, Aardvark filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025, and issued a press release announcing the same. This press release quoted Defendant Lee as stating Defendants "ha[d] been working closely with the FDA to comprehensively evaluate the data" that prompted Defendants to voluntarily pause the HERO trial. Defendant Lee further stated that Defendants "look forward to providing an updated in the second quarter", giving no indication that the FDA could place a clinical hold on Defendants' IND application for ARD-101, stating *inter alia*:

> "*We have been working closely with the FDA to comprehensively evaluate the data following the reversible cardiac observations* in the healthy volunteer trial and are committed to determining the best path forward for our programs, patients and the broader PWS community," said Tien Lee, M.D., Founder and Chief Executive Officer of Aardvark. "*We* remain focused on establishing a clear path forward for the Phase 3 HERO trial evaluating ARD-101 in PWS, our lead program, and *look forward to providing an update in the second quarter*."

75.    The statements referenced in ¶¶ 70–74 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) ARD-

25

101 was less safe than Defendants had led investors to believe; (ii) accordingly, ARD-101's clinical, regulatory, and commercial prospects were overstated; and (iii) as a result, the Exchange Act Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Continues to Emerge

76.    On May 14, 2026, Aardvark issued a press release "announc[ing] that the U.S. Food and Drug Administration (FDA) has placed a full clinical hold on its investigational new drug application (IND) for ARD-101 related to the Company's previously announced voluntary pause."  The press release specified that "[t]he clinical hold applies to all ongoing clinical studies under the IND, including the Phase 3 HERO trial (AVK-101-301) evaluating ARD-101 for the treatment of hyperphagia in patients with Prader-Willi Syndrome (PWS) and the Phase 3 open-label extension (OLE) trial (AVK-101-302)."

77.    On this news, Aardvark's stock price fell $2.16 per share, or 32.1%, to close at $4.57 per share on May 15, 2026.

78.    As of the time this Complaint was filed, Aardvark's common stock continues to trade below the $16.00 per share Offering price, damaging investors.

79.    Following Defendants' revelations, analysts again lowered their respective price targets for Aardvark's stock or abandoned them altogether.  On May 15, 2026, Morgan Stanley Research downgraded Aardvark's stock from Equal-weight to Underweight, and reduced its price target approximately 57.1%,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from $7 to $3, citing the FDA's full clinical hold on ARD-101 and stating "[w]e believe the update raises further questions on a potential path forward while limited cash runway creates greater uncertainty." Also on May 15, 2026, Bank of America Global Research downgraded Aardvark's stock from Buy to Underperform, and reduced its price target approximately 77.8%, from $18 to $4, writing "we look for clarity on next steps following the FDA's issuance of a clinical hold on the IND for lead program, ARD-101." On that same date, BTIG downgraded Aardvark's stock from Buy to Neutral and rescinded its price target of $9, given its policy of not providing price targets on neutral-rated stocks, writing that the FDA's full clinical hold on ARD-101 "escalat[ed] from AARD's voluntary pause", and that "until we get more clarity . . . we are stepping to the sidelines."

80. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Aardvark's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

81. During the Class Period, the Exchange Act Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. ARD-101 was Defendants' lead product candidate and Defendants repeatedly spoke to its safety profile, as alleged *supra* ¶¶ 46, 48–51, 55, 57–58, 61–64, 71, and their "close[]" working relationship

27

with the FDA in connection with their IND for ARD-101, as alleged *supra* ¶¶ 47, 59, 74. In so doing, the Exchange Act Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Aardvark common stock in the IPO or purchased Aardvark common stock thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; and/or (b) Aardvark securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

83.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aardvark securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery,

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Aardvark or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

86. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Aardvark;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact

29

or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Aardvark to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Aardvark securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

88.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Aardvark securities are traded in an efficient market;

30

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Aardvark securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

89.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

90.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 11 of the Securities Act Against the Securities Act Defendants)**

91.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

31

92.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

93.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

94.     Aardvark is the registrant for the IPO.  The Securities Act Defendants were responsible for the contents and dissemination of the Offering Documents.

95.     As issuer of the shares, Aardvark is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

96.     None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

97.     By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

98.     Plaintiff acquired Aardvark shares pursuant and/or traceable to the Offering Documents for the IPO.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

99. Plaintiff and the Class have sustained damages. The value of Aardvark securities has declined substantially subsequent to and because of the Securities Act Defendants' violations.

## **COUNT II**

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

100. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

101. This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

102. The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Aardvark within the meaning of Section 15 of the Securities Act. The Securities Act Individual Defendants had the power and influence and exercised the same to cause Aardvark to engage in the acts described herein.

103. The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

33

104. By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

105. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

106. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

107. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii)

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

artificially inflate and maintain the market price of Aardvark securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Aardvark securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

108. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aardvark securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Aardvark's finances and business prospects.

109. By virtue of their positions at Aardvark, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange

35

Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

110. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Aardvark, the Exchange Act Individual Defendants had knowledge of the details of Aardvark's internal affairs.

111. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Aardvark. As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Aardvark's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Aardvark securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Aardvark's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the

36

Class purchased or otherwise acquired Aardvark securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

112.   During the Class Period, Aardvark securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Aardvark securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Aardvark securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Aardvark securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

113.   By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

114. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

115. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116. During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Aardvark, and conducted and participated, directly and indirectly, in the conduct of Aardvark's business affairs. Because of their senior positions, they knew the adverse non-public information about Aardvark's misstatement of income and expenses and false financial statements.

117. As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aardvark's financial condition and results of operations,

38

and to correct promptly any public statements issued by Aardvark which had become materially false or misleading.

118.   Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aardvark disseminated in the marketplace during the Class Period concerning Aardvark's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Aardvark to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants therefore, were "controlling persons" of Aardvark within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aardvark securities.

119.   Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Aardvark.  By reason of their senior management positions and/or being directors of Aardvark, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Aardvark to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Aardvark and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

120. By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aardvark.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 14, 2026                    Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor

40

Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS